MINNESOTA INVCO OF RSA # 7, INC., Minnesota INVCO of RSA # 8, Inc., Minnesota INVCO of RSA # 9, Inc., Minnesota INVCO of RSA # 10, Inc., and United States Cellular Corporation, Plaintiffs,

v.

MIDWEST WIRELESS HOLDINGS LLC, Midwest Wireless Communications LLC, Dennis E. Miller, Dennis Findley and Bill D. Otis, Defendants.

C.A. No. 1887–N.

Court of Chancery of Delaware, New Castle County.

Submitted: May 23, 2006.
Decided: June 7, 2006.

Gregory P. Williams, Esquire, Catherine G. Dearlove, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware; Richard J. O'Brien, Esquire, David B. Johnson, Esquire, Danielle J. Carter, Esquire, Sidley Austin LLP, Chicago, Illinois, Attorneys for the Plaintiffs.

P. Clarkson Collins, Jr., Esquire, Lewis H. Lazarus, Esquire, Patricia R. Uhlenbrock, Esquire, Morris James Hitchens & Williams LLP, Wilmington, Delaware; James G. Bullard, Esquire, Nancy A. Wiltgen, Esquire, Leonard Street and Deinard, PA, Minneapolis, Minnesota, Attorneys for the Defendants.

## OPINION

LAMB, Vice Chancellor.

Minority interest holders of a Delaware limited liability company seek specific performance of a right of first refusal contained in the LLC's operating agreement which, they claim, prohibits the sale of the parent company to a third party without first offering them the right to purchase the parent company's interest in the LLC. The defendants respond that the claimed right of first refusal conflicts with the "drag along" provision of a later adopted, fully integrated contract between the parties. Following an expedited trial, the court concludes that the "drag along" provision found in the later agreement clearly governs the transaction at issue and conflicts with the right of first refusal provision found in the operating agreement. Therefore, the court concludes that the plaintiffs do not have a right of first refusal in connection with the disputed transaction, and that the defendants are entitled to rely on the "drag along" rights to complete the transaction.

## I.

The plaintiffs are United States Cellular Corporation, a Delaware corporation headquartered in Chicago, Illinois, and regional provider of wireless communications services, together with four of its affiliated rural service providers: Minnesota Invco of RSA # 7, Inc., Minnesota Invco of RSA # 8, Inc., Minnesota Invco of RSA # 9, Inc., and Minnesota Invco of RSA # 10.[1] United States Cellular and its subsidiaries are controlled by nonparty Telephone and Data Systems, Inc. and are referred to collectively, in this opinion, as TDS.[2]

TDS owns approximately 14.1% of the membership interest, or units, in Midwest Wireless Communications LLC ("Communications"), a Delaware limited liability company with its principal place of business in Mankato, Minnesota named as a

1. PTO 1-4; Tr. 12-15. RSA is the acronym for rural service area.

2. Tr. 60-61. Both TDS and United States Cellular are public companies listed on the American Stock Exchange. United States Cellular is the sixth largest wireless provider in the United States.

defendant in this action. Communications was organized in 1995 to provide cellular telecommunications services in Minnesota.[3] The other corporate defendant is Midwest Wireless Holdings LLC ("Holdings"), also a Delaware limited liability company with its principal place of business in Mankato, Minnesota. Holdings was formed in 1999 by the holders of approximately 86% of the membership interest in Communications to take advantage of the opportunity to acquire two additional rural telecommunication businesses in Wisconsin and Iowa.[4] Holdings was capitalized by the contribution of the 86% membership interest in Communications in exchange for 100% of its membership interest. Holdings operates a single, integrated telecommunications business under the name Midwest Wireless through its three operating subsidiaries: Communications, 86% owned by Holdings, and the wholly owned Wisconsin and Iowa subsidiaries.

The complaint also names three individual defendants: Bill D. Otis, the president and CEO of New Ulm Telecom, a member of Holdings,[5] and a member and current chairman of the board of managers of both Holdings and Communications;[6] Dennis E. Miller, former president and manager of Communications since 1995, and president and chief executive officer of Holdings since 1999;[7] and Dennis Findley, secretary, treasurer, and a manager of Communications, as well as senior vice president of finance and chief financial officer of Holdings.[8] Otis, Miller, and Findley constitute the entire board of managers of Communications.[9]

## II.

This lawsuit arises out of the announced sale of Holdings to Alltel Corporation. TDS takes the position that the proposed sale of Holdings triggers a right of first refusal contained in the Communications limited liability company agreement. Essentially, TDS argues that Holdings cannot be sold as an entity to a third party without first offering TDS the opportunity to purchase the membership units of Communications held by Holdings. The defendants dispute that TDS has a right of first refusal in the proposed sale of Holdings and assert that an agreement made between the parties in 1999, which provided them with the right to "drag along" TDS in the event of a sale of Holdings, governs the transaction.

### A. The Formation Of Communications

In 1995, five limited partnerships, which each owned wireless communications assets in Minnesota, formed Communications to operate an integrated wireless communication business.[10] The five limited partnerships, pursuant to a consolidation agreement, dissolved their partnerships and contributed substantially all of their

---

3. Pre–Trial Order (PTO) 7, 12; JX 1.

4. *Id.* at 6; JX 2.

5. PTO 10; Tr. 443–46.

6. *Id.*

7. PTO 8; Tr. 285–86.

8. PTO 9; Tr. 419–20.

9. PTO 11. Findley and Miller have never served on Holdings's board of managers.

10. Tr. 44. In the mid–1980s, the Federal Communications Commission divided the nation into rural service areas (RSAs) and metropolitan statistical areas (MSAs). The five limited partnerships each owned an FCC spectrum license for an individual RSA in Minnesota. When Communications was formed, RSAs # 7, # 8, # 9, # 10, and # 11 were combined to operate an integrated cellular telephone service.

assets to Communications in exchange for ownership units in Communications, which were assigned to the partnerships based on their pro rata share of the assets contributed.[11] The plaintiffs had a minority ownership interest in each of these limited partnerships.[12]

## B. *The 1995 LLC Agreement*

As part of the transaction described above, on May 16, 1995, the members of Communications executed a limited liability company agreement (the "1995 LLC Agreement") which contained, among other things, a broad right of first refusal governing the transfer or disposition of units in Communications in certain circumstances.[13] Section 8.5(a) provides that the members and the company shall have the right to purchase all, but not less than all, of the offered units at the offered price whenever a member receives a bona fide offer to:

sell, assign, pledge, transfer, convey, give or otherwise dispose of all or any part of any Unit of which it is the Beneficial Owner, directly or indirectly (including through any transfer of securities, merger, share exchange or consolidation) (a "Transfer") only after receipt of a bona fide offer in writing from a bona fide purchaser (an "Offer").[14]

In addition, the 1995 LLC Agreement contains a so-called "acquiring person" provision, which operates to preclude any member whose ownership interest exceeds 30% from exercising majority voting power. The purpose of this provision is to prevent any single member who acquires 30% or more of Communications from controlling the company.

## C. *The 1999 Restructuring And The Formation Of Holdings*

In 1999, Communications sought to acquire wireless assets in Iowa and Wisconsin to expand its network, but was prohibited from doing so by the FCC's cross-ownership rule because TDS owned and operated competing cellular businesses in that territory.[15] To comply with the FCC cross-ownership rule, the members of Communications and TDS agreed to a restructuring that resulted in the formation of Holdings.[16] Under the restructuring, all of the members of Communications, except TDS, exchanged their units in Communications for units in Holdings.[17] Holdings then purchased the Iowa and Wisconsin assets and placed them into wholly owned subsidiaries. As a result, (1) Holdings became the owner of a controlling interest in, and the operator of, an integrated enterprise,[18] comprising operations in Minnesota, Wisconsin, and Iowa

11. Tr. 286–89, 292, 305; JX 59.

12. *Id.* Each plaintiff had a minority ownership interest, ranging from 8.33% to 14.76%, in one of these limited partnerships. The remaining interests in the limited partnerships were owned by approximately 36 other entities, each having an individual ownership interest in one or more of the limited partnerships.

13. JX 1.

14. *Id.*

15. PTO 14; Tr. 307–308; JX 2. At that time, the FCC had a cross-ownership rule which

permitted the acquisition of partnerships in Iowa and Wisconsin by Communications only if TDS's ownership interest in Communications did not exceed 5%.

16. JX 2.

17. PTO 15. TDS remained a member of Communications, owning approximately 14% of the company.

18. Holdings developed and marketed itself as a fully integrated wireless business, offering wireless communication and information services throughout Minnesota, Iowa, and Wisconsin under the common brand name "Midwest Wireless." Tr. 315–19.

through its ownership of approximately 86% of Communications and 100% of the Iowa and Wisconsin subsidiaries, and (2) TDS, while excluded from any ownership and management interest in Holdings and the Iowa and Wisconsin subsidiaries, was given economic benefits as if it were a member of Holdings.[19]

As part of the restructuring, TDS, Communications, and Holdings entered into an agreement, referred to as the 1999 Agreement, to ensure that TDS was not economically disadvantaged as a result of the restructuring and its exclusion from participation in the ownership and management of Holdings and the Iowa and Wisconsin subsidiaries.[20] William DeCarlo, counsel for TDS, and Steven DeRuyter, counsel for Midwest Wireless, were the principal negotiators and drafters of the Agreement.

Specifically, the 1999 Agreement includes terms designed to provide TDS with the right to participate in the economic success of Holdings and the Iowa and Wisconsin subsidiaries. For example, paragraph 2 of the Agreement grants TDS option rights to convert its units in Communications into units in Holdings, and paragraph 6 of the Agreement provides TDS with the right to receive distributions, or so-called "management fees," as an investor in Communications equal to approximately 11% of Holdings's total profits, losses, and distributions of cash, or such lesser percentage equal to the percentage of units TDS would hold if it had exercised its option rights.[21] These "management fees" were to be paid in lieu of distributions of profits pursuant to the 1995 LLC Agreement.

The 1999 Agreement also establishes a series of rights, obligations, and procedures in the event of a proposed sale or other disposition of all or substantially all of Holdings's outstanding units or assets. Specifically, the Agreement provides that "in the event of: (a) a proposed sale, assignment, exchange or other disposition (directly or indirectly) of all or substantially all of Holdings'[s] outstanding units, or (b) a proposed sale, assignment, exchange or other disposition (directly or indirectly) of all or substantially all of the assets of Holdings," TDS has a right to "tag along" by exchanging its interests in Communications for interests in Holdings.[22] However, if TDS does not exercise these "tag along rights," then Holdings has the option to compel such transfer "immediately prior to, or upon the consummation of, such transaction" by exercising its "drag along" rights.[23] The Agreement further provides that, "should Holdings so require Minority Investor to so transfer its units in Midwest Minnesota, Minority Investor shall be obligated to transfer its units and take all other actions reasonably requested of Minority Investor by Holdings to cooperate in the closing of the transaction."[24] The 1999 Agreement also describes certain events—principally a reorganization of

---

19. *Id.*

20. JX 2. The stated purpose of the 1999 Agreement is that "the parties desire to reach an economic result to minimize any disadvantage to Minority Investors and Midwest Minnesota resulting from the exclusion of Minority Investor from a direct or indirect ownership or management interest in the Iowa and Wisconsin cellular properties to be acquired in the Iowa and Wisconsin Transactions."

21. PTO 17.

22. JX 2 ¶ 3.

23. *Id.* at ¶ 5. The tag along and drag along rights only apply if TDS has not already exercised its conversion options.

24. JX 2 ¶ 5; *see also* ¶ 7(b) which states that the parties "shall do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement."

Holdings—that give rise to "tag along" rights but not "drag along" rights.[25]

The 1999 Agreement does not specifically mention, and the parties' negotiations did not include, any discussion dealing with whether TDS's right of first refusal under the 1995 LLC Agreement survived after the restructuring or whether, in the event of a sale of Holdings, that right was superseded by the tag along and drag along rights.[26] However, the 1999 Agreement contains a conflict provision and a broad integration clause. Paragraph 7(d) states that "in the event of a conflict between the [1995 LLC Agreement], as amended, and this Agreement, the terms of this Agreement shall govern." Paragraph 7(f) provides, in pertinent part, that "this Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof."

## D. The Sale Of Holdings

In 2005, the Holdings board retained Bear, Stearns & Co. Inc. to pursue a potential sale of the entire company.[27] Bear Stearns prepared a confidential information memorandum and contacted several potential acquirers, including TDS. TDS initially showed interest in purchasing Holdings, but decided not to submit a bid because it was concerned that it would have to divest Holdings's Iowa and Wisconsin assets due to its already existing ownership of other cellular businesses in those markets.[28] At this time, TDS did not assert that a sale of Holdings would trigger a right of first refusal entitling it to purchase Holdings's 86% ownership interest in Communications.[29] In fact, TDS

25. JX 2 ¶¶ 3, 5 ("3. *Tag-Along Rights*. In the event of: (a) a proposed sale, assignment, exchange or other disposition (directly or indirectly) of all or substantially all of Holdings'[s] outstanding units, or (b) a proposed sale, assignment, exchange or other disposition (directly or indirectly) of all or substantially all of the assets of Holdings or (c) a proposed reorganization or recapitalization (directly or indirectly) of Holdings which results in less than fifty percent (50%) of the ownership interests of the surviving entity being held of record or beneficially by the members of Holdings immediately prior to such reorganization, or (d) a proposed reorganization or recapitalization (directly or indirectly) of Midwest Minnesota which results in less than fifty percent (50%) of the ownership interests of the surviving entity being held of record or beneficially by Holdings or the members of Holdings immediately prior to such reorganization, then Holdings shall provide to Minority Investor written notice of such proposed event not less than 45 days prior to the date of consummation of such transaction. * * * 5. *Drag-Along Rights*. In the event of a proposed transaction described in Section 3(a) or (b) above (but not (c) or (d)), and in the event that Minority Investor does not exercise its option right pursuant to Section 3 of this Agreement, Holdings at its option may require Minority Investor to transfer its units in Midwest Minnesota as part of such transaction (which transfer shall take place immediately prior to, or upon, the consummation of such transaction)....").

26. JX 2; Tr. 204, 223, 242, 362, 541–42. TDS's right of first refusal was never discussed between DeCarlo and DeRuyter when they negotiated the terms of the 1999 Agreement.

27. Tr. 324–26.

28. Tr. 156, 160, 329. TDS signed a nondisclosure agreement with Bear Stearns and received the confidential information memorandum concerning the proposed sale of Holdings.

29. The court rejects DeCarlo's testimony that he discussed TDS's right of first refusal with DeRuyter in a telephone conversation on October 26, 2005. Tr. 210–14. DeRuyter testified that DeCarlo never mentioned TDS's right of first refusal during that telephone call, and his detailed notes of the conversation are consistent with his recollection. Tr. 518–22, JX 121. Specifically, DeRuyter testified:

Q. Was there any mention during the call by Mr. DeCarlo of TDS's rights of first refusal in Communications?

supported the auction process and encouraged Holdings to get the maximum price for the company as a whole.[30]

During September and October of 2005, several prospective bidders expressed to Bear Stearns and Holdings concern that TDS might have a right of first refusal in the event of a sale of Holdings, at either the Communications level or, if TDS converted its units in Communications to units in Holdings, at the Holdings level.[31] Therefore, in order to obtain the highest price from the bidders, on November 11, 2005, the board of managers of both Holdings and Communications voted to amend their respective LLC agreements to eliminate all members' rights of first refusal.[32] Holdings formally voted its 86% interest in Communications in favor of the amendment.[33] The Communications board notified TDS after the amendments were approved, and TDS, at that time, did not raise any objection.[34]

On November 17, 2005, Holdings announced that it entered into a transaction agreement with Alltel Corporation, pursuant to which Alltel would acquire all of Holdings for $1.075 billion.[35] Under the Alltel agreement, the members of Holdings were asked to approve a sale of substantially all of Holdings's assets and also to approve a merger in lieu of the asset sale.[36] In January of 2006, 97% of the

---

A. No.

Q. Did you have any previous conversations, previous to October 26, 2005, with Mr. DeCarlo or any TDS representative about the rights of first refusal in connection with the auction transaction that was being pursued?

A. No.

Furthermore, DeRuyter testified that, had DeCarlo mentioned that he thought TDS had a right of first refusal, "it would have been equivalent to a bomb going off in the middle of the deal." This is because, DeRuyter explained, Holdings would have had to immediately inform all of the bidders that TDS was claiming a right of first refusal to purchase a portion of Holdings, which would have probably caused an abrupt ending to the auction process. Tr. 518.

30. Tr. 253, 329, 342, 514–17. DeCarlo testified:

Q. Do you recall telling Mr. DeRuyter in the course of the call that TDS was supportive of the sale of Holdings?

A. Yes, I do.

Q. Do you recall telling Mr. DeRuyter to get the best value they could for the sale of Holdings.

A. Yes, I do.

Tr. 253.

31. JX 32, 35, 37, 38; Tr. 339–40, 526–27, 557. Holdings had an LLC agreement that mirrored the 1995 LLC Agreement and contained the same right of first refusal provision.

32. JX 15–17, 127; Tr. 339–40.

33. Tr. 586.

34. *Id.;* Tr. 216, 342, 531. On November 11, 2005, De Ruyter sent an e-mail to DeCarlo informing him of these amendments. In addition, DeRuyter mailed a copy of the amendments to DeCarlo. DeRuyter testified that he did not receive a response from DeCarlo or anyone else at TDS.

35. JX 55; PTO 19.

36. *Id.* Specifically, the members of Holdings were asked to approve a sale to a transaction subsidiary of substantially all of the assets of Holdings. The members were also asked to approve the merger of a transaction subsidiary into Holdings, pursuant to which Holdings would survive as a wholly owned subsidiary. If the members approved the merger, Holdings would proceed with the merger in lieu of the asset sale. Once the merger was approved, the outstanding membership units of Holdings would be converted into the right to receive a cash payment equal to the per-unit merger consideration. Evidently, Holdings believed that the drag along rights would apply to the asset sale structure of the Alltel agreement, pursuant to sections 3(b) and 5 of the 1999 Agreement. However, there was apparently some uncertainty as to whether the merger transaction would trigger the drag along rights or whether it would be considered a "reorganization" triggering only the tag along rights under section 3(c).

members of Holdings approved the Alltel transaction to proceed as a merger.[37]

After learning of the Alltel deal, DeCarlo sent an email to DeRuyter congratulating him on the transaction.[38] On December 14, 2005, TDS met with Holdings to discuss how the Alltel deal would affect its rights. At that meeting, TDS raised for the first time its belief that it had a right of first refusal at the Communications level in connection with the Alltel transaction.[39] The next day, Holdings provided TDS with written notice in accordance with the 1999 Agreement requesting that it exercise its tag along rights, and informing TDS that if it chose not to exercise those rights Holdings would exercise its drag along rights.[40]

Shortly thereafter, TDS filed this action seeking an order of specific performance compelling Holdings to honor its right of first refusal at the Communications level. In essence, TDS argues that Holdings does not have the right to assert its drag along rights and complete the transaction without first offering the Communications units to TDS. The Holdings defendants contend that TDS does not have a right of first refusal in connection with the Alltel transaction, and ask this court to declare that Holdings may exercise its drag along rights to complete the transaction.

In addition, TDS challenges Communications's board approval of the November 11, 2005 amendment to the 1995 LLC Agreement which eliminated its right of first refusal. First, TDS argues that the amendment was not validly enacted because Holdings was an "acquiring person" under the 1995 LLC Agreement and could only vote 30% of its shares for the amendment.[41] Second, TDS claims that the board members breached their fiduciary duty of care by approving the amendment without fully understanding or considering how it would affect TDS's first refusal rights. Finally, TDS makes a perfunctory argument that the board members breached their duty of loyalty in authorizing the amendment.

A three-day trial was held in early May 2006, followed by post-trial briefing.

### III.

 TDS seeks an order of specific performance compelling Holdings to comply with the right of first refusal process provided in the 1995 LLC Agreement. "Specific performance is a matter of grace that rests in the sound discretion of the court."[42] Under Delaware law, a party seeking the equitable remedy of specific performance must prove the existence and terms of an enforceable contract by clear and convincing evidence.[43] Furthermore, the party must demonstrate that there is no adequate remedy at law.[44]

### A. The Right Of First Refusal

 The main issue before the court is whether TDS has a right of first refusal with respect to the units in Communications arising out of the pending transaction

---

37. Tr. 429, 537. There were no dissenting votes.

38. JX 48.

39. Tr. 339.

40. JX 20; PTO 21.

41. JX 1. A 60% supermajority vote of all outstanding Communications units is required to amend the agreement.

42. *Peden v. Gray*, 2005 WL 2622746 at *3, 2005 Del. LEXIS 389 at *11 (Del. Oct. 14, 2005).

43. *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14 (Del.Ch.2001).

44. *Id.*

between Holdings and Alltel. In particular, the court must determine the parties' contractual rights and duties under the 1995 LLC Agreement and the 1999 Agreement.

The construction of these agreements is governed by the well-settled principle that contracts should be construed, wherever possible, to harmonize and give effect to all of their provisions.[45] "If the relevant contract language is clear and unambiguous, courts must give the language its plain meaning."[46] However, if the terms are ambiguous, the court may look to extrinsic evidence to determine the intent of the parties. With that said, "a contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[47] Rather, the settled test for ambiguity is whether "the provisions in

controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[48]

Here, the court's conclusions are twofold. First, the 1999 Agreement clearly governs the Alltel transaction and provides Holdings with drag along rights. The 1999 Agreement expressly states that Holdings, in the event of a proposed sale of all, or substantially all, of its assets, directly or indirectly, may compel TDS to transfer its units in Communications and "take all other actions reasonably requested ... to cooperate in the closing of the transaction."[49] Since the Alltel transaction provides for either the sale to Alltel of all of Holdings's assets (direct sale), it triggers TDS's tag along rights and Holdings's drag along rights, if TDS does not exercise its tag along rights.[50]

---

**45.** *Bayless v. Davox Corp.*, 2000 WL 268310 at *5, 2000 Del.Ch. LEXIS 35 at *18 (Del.Ch. Mar. 1, 2000).

**46.** *Phillips Home Builders v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del.1997).

**47.** *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992) (explaining that creating an ambiguity where none exists could create new contractual rights, liabilities, and duties which the parties had not agreed to).

**48.** *Id.*

**49.** JX 2 ¶¶ 3, 5.

**50.** *Id.* The omission of any reference to the terms "merger" or "consolidation" in section 3 of the 1999 Agreement creates some lack of clarity, although it is likely that the alternative proposal to merge with Alltel falls within the scope of section 3(a) and, thus, section 5 of the 1999 Agreement. Ultimately, that omission is not material to the court's decision since TDS concedes that, if the court rejects its assertion of a right of first refusal in the case of a sale of Holdings's assets, it will not claim that the possibility of consummating the transaction as a merger will necessitate a different outcome. Even without such a concession, however, the outcome would be the same if the court were to construe the right of

first refusal provision of the 1995 LLC Agreement as having no application in the case of a statutory merger of Communications with and into some other entity, since the transaction now contemplated entails just such a merger with a subsidiary of Alltel (i.e. the TDS merger).

Although the court does not rest its holding in the case on such a conclusion, there is substantial evidence that the right of first refusal found in section 8.5(a) of the 1995 LLC Agreement should not be read to apply in the case of a merger or consolidation approved by the Communications board of managers. For example, section 5.18(a) of that Agreement expressly authorizes the board of managers to approve mergers or consolidations to which Communications or a subsidiary is a party. Similarly, while the language of section 8.5(a) of that Agreement refers to mergers and consolidation, the context of that reference clearly limits it to mergers or consolidations involving members of Communications and not to a merger or consolidation to which Communications itself is a party. At the time of its formation, Communications had a large number of members. To suggest, as TDS implicitly does, that a merger approved by the board of managers of Communications in 1996 would have given rise to rights of first refusal between and among every one of Communications's mem-

Furthermore, the 1999 Agreement contains a broad integration clause which states, "this Agreement constitutes the entire agreement and supercedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof."[51] The rights of the parties in the case of an enterprise-wide transaction involving Holdings are clearly "subject matter" addressed in the 1999 Agreement, in particular the tag along and drag along rights defined in sections 3 and 5 thereof.[52] It is undisputed that the 1999 Agreement makes no provision for any "right of first refusal" at all, including in connection with the sale of Holdings. Therefore, a plain reading of the integration clause suggests that there is no right of first refusal in connection with any transaction—including the Alltel transaction—that falls within the scope of the transactions described in sections 3 and 4 of the 1999 Agreement.[53] The proposed sale of all Holdings assets (including its 86% ownership interest in Communications) clearly falls within the scope of section 3(b) and, thus, gives rise to both tag along and drag along rights.

Second, Holdings's drag along rights in the 1999 Agreement directly conflict with TDS's asserted right of first refusal in the 1995 LLC Agreement. Paragraph 7(d) of the 1999 Agreement expressly states that, if there is a "conflict between the Limited Liability Company Agreement ... and this Agreement, the terms of this Agreement shall govern."[54] The 1999 Agreement allows Holdings, if TDS does not exercise its tag along rights, to require TDS to transfer its units in Communications to complete the transaction. The plain language of paragraph 5 of the 1999 Agreement obligates TDS to "transfer its units and take all other actions reasonably requested ... by Holdings to cooperate in the closing of the transaction."[55] In contrast, a right of first refusal would allow TDS to hold onto its Communications units and purchase from Holdings the remaining 86% share in Communications. If TDS could exercise such a right of first refusal, Holdings's drag along rights would be eliminated. In effect, Holdings would not be able to "drag" TDS into the deal, but rather TDS would be able to unilaterally block the transaction by purchasing the Communications units held by Holdings. This is a plain conflict requiring, for its resolution, that the terms of the 1999 Agreement govern.

Any other result would uniquely advantage TDS over the members of Holdings

bers would abnegate the board of managers' expressly authorized power. The language of section 8.5(a) simply does not support such a radical construction. DeCarlo recognized as much in his trial testimony. Tr. 280.

**51.** JX 2 ¶ 7(f).

**52.** TDS's argument, based on DeCarlo's trial testimony, that the court should narrowly construe the term "subject matter" so that the integration clause is strictly limited to the section in the 1999 Agreement that discusses the purpose of that Agreement, and does not apply to the pertinent sections at issue in this trial, such as the drag along provisions, borders on absurdity. The term "subject matter," as used in the integration clause, clearly refers to all the specific topics addressed by the 1999 Agreement, such as the option rights, tag along rights, drag along rights, and management fees.

**53.** *American Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 19 (Del.Ch.2005) (explaining that, where the parties have created an unambiguous integrated written contract, the language of that contract controls); *See Karish v. SI Int'l, Inc.*, 2002 WL 1402303 at *3, 2002 Del.Ch. LEXIS 77 at *9–10 (Del.Ch. June 24, 2002) (holding that "in order to harmonize two agreements, a court may find it necessary to give primacy to one agreement when there is a dispute").

**54.** JX 2.

**55.** JX 2 ¶ 5.

simply as an unintended consequence of the 1999 restructuring.[56] The trial record does not reflect that this was the intention of the parties when they restructured the business and formed Holdings. To the contrary, the purpose of the 1999 Agreement was to protect TDS against being disadvantaged by the restructuring, as expressed in section 1 thereof—not advantaged over the former members of Communications who formed Holdings.[57] The record reflects that TDS has always been treated equally with the members of Holdings.[58] TDS has consistently received distributions based on profits generated by Holdings, and not Communications, and will receive its pro rata share of the proceeds of the Alltel transaction.[59] Given the nature and purpose of the 1999 restructuring, that is all TDS is entitled to get.

### B. The LLC Amendment

■ TDS argues that the November amendment to the 1995 LLC Agreement to eliminate rights of first refusal was invalid because Holdings was an "acquiring person" under the agreement, and thus was prohibited from voting more than 30% of the Communications voting power for the amendment. In addition, TDS argues that the manager defendants breached their fiduciary duty of care because they were not fully informed when they amended the 1995 LLC Agreement to eliminate the right of first refusal.[60]

#### 1. Holdings Not An Acquiring Person

The argument that Holdings's voting power in Communications is limited by the "acquiring person" provision of the 1995 LLC Agreement is clever but, ultimately, unavailing. It is true that the language defining an "acquiring person" used in drafting the 1995 LLC Agreement literally includes Holdings because Holdings is a "Person who or which shall be the Beneficial Owner of 30% or more of the Common Units then outstanding." As a result of the 1999 reorganization, Holdings became the beneficial owner of 86% of the Communications units, clearly exceeding this standard. Nevertheless, given the undisputed history and purpose of that reorganization, any reading that applies the "acquiring person" provisions to apply to Holdings creates, at the very least, a significant ambiguity. Indeed, it is impossible to conceive that any of the parties to that reorganization ever contemplated, much less intended, that, as a result of it, the owners of 86% of the voting power would surrender voting control over Communications to TDS.[61]

Treating Holdings as an "acquiring person" under the 1995 LLC Agreement runs counter to the very structure and purpose of the 1999 transaction by which Holdings was created to act as the parent of Communications in order both to facilitate the Iowa and Wisconsin acquisitions and to operate a single, integrated telecommuni-

---

**56.** As discussed above at footnote 50 the right of first refusal is best read as not applying in the case of a merger involving Communications—even one in which all units of the enterprises are cashed out. There is no suggestion in the record that the 1999 restructuring was intended to give TDS the power to prevent a similar transaction involving the restructured entity.

**57.** JX 2.

**58.** Tr. at 63–64, 421–23.

**59.** *Id.*

**60.** Pl.'s Post–Trial Br. 47. TDS also half-heartedly argues a breach of the duty of loyalty.

**61.** DeCarlo admitted as much in his trial testimony. Tr. 277–79.

cations business. Since that time, Holdings has operated Communications's business as a part of the integrated business of Midwest Wireless and has consistently exercised its majority voting power, without objection, in all matters requiring a vote at Communications. This is plainly what everyone, including TDS, expected and intended would happen when the 1999 reorganization was negotiated as a means of overcoming TDS's cross-ownership problems.

Whether the issue is conceptualized as one of contractual ambiguity or something else, it is plain that Holdings cannot reasonably be treated as an "acquiring person" for purposes of the 1995 LLC Agreement.[62] Doing so would turn the structure crafted by the 1999 Agreement on its head, turning over control of Communications to its 14% minority investor and leaving the majority owner in an impossible position. For these reasons, the court rejects the argument that Holdings should be treated as an "acquiring person" for the purposes of the 1995 LLC Agreement.

### 2. Breach Of Fiduciary Duty Of Care

It is well settled under the Delaware business judgment rule that, in making a business decision, the directors of a corporation are presumed to act on an informed basis, in good faith, and in the honest belief that the action taken is in the best interest of the company.[63] However, "to invoke the rule's protection, directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." [64]

■ The court finds that the Communications board members did not breach their duty of care when they approved the amendment. The evidence at trial shows that each of Otis, Miller, and Findley approved the amendment, upon the advice of counsel and Bear Stearns, with the good faith belief that the amendment would provide prospective bidders with additional assurances in order to maximize the sale price for Holdings and get the best possible value for its unit holders and for TDS.[65] Therefore, the court concludes that the board members were fully informed and acted in the best interest of Communications and each of its unit holders when it

---

62. It is also possible to conceive of the problem as involving an incomplete documentation of the understanding reached by the parties in 1999, in the sense that all that is missing is a term in the 1999 Agreement stating that "Holdings is not an 'acquiring person' for the purposes of the LLC agreement." This sentence certainly would have expressed the shared implicit understanding of the parties and, through the operation of the conflict provision of section 7(d), would have resolved the issue. Given the irrationality of applying the literal language of the 1995 LLC Agreement to Holdings, and the clear evidence that the parties never intended to apply the "acquiring person" limitations to Holdings, the court infers the existence of this term in order to resolve the otherwise ambiguous situation. *Peden*, 2005 WL 2622746, 2005 Del. LEXIS 389; *see also Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232

(Del.1997) (holding that where "there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.").

63. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

64. *Id.*

65. Tr. 339–42, 428–29, 452–55; JX 32, 37, 38, 39. The court does not find that the managers amended the first refusal provision of the 1995 LLC Agreement because they believed that the Alltel transaction triggered these rights. Rather, the evidence at trial shows that they amended the Agreement to provide clarification for bidders. In fact, Alltel actually increased its bid after the amendment.

amended the 1995 LLC Agreement to eliminate rights of first refusal.[66]

Accordingly, the court finds that the board of Communications properly amended the 1995 LLC Agreement to clarify that TDS did not have a right of first refusal at the Communications level with respect to the Alltel transaction.

## IV.

For the foregoing reasons, the court holds that (1) TDS does not have a right of first refusal with respect to the Alltel transaction, and (2) Holdings may assert its drag along rights to complete the transaction. IT IS SO ORDERED.

---

**66.** TDS also argues, formulaically, that the defendant board members breached their duty of loyalty by "acting as a rubber-stamp for Holdings" when they approved the amendment. The court does not find that the Communications board members were dominated and controlled by Holdings or that they lacked independent judgment when they approved the amendment. Rather, the court concludes that the Communications board members approved the amendment to clarify the lack of a right of first refusal and, thus, to secure the highest value reasonably attainable for unit holders of Communications, including TDS. Each of the board member testified that he believed he was acting in the best interest of Communications and TDS when he passed the amendment. Tr. 339–42, 428–29, 452–55; *In re CompuCom Sys. S'holders Litig.*, 2005 WL 2481325 at *8, 2005 Del.Ch. LEXIS 145 at *37–38 (Del.Ch. Sept. 29, 2005) (holding that the court cannot reasonably conclude that the directors were dominated and controlled or improperly influenced by the controlling shareholder when they sold the company to an independent third party). This testimony was forthright and highly credible.