# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD A. GRACIANO, JR. AS SELLERS' REPRESENTATIVE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-0728-SG |
| ABODE HEALTHCARE, INC. and BRIGHTSPRING HEALTH SERVICES, INC., | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CITIBANK, N.A., | ) ) | |
| Escrow Agent Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  November 29, 2023
Date Decided:  March 4, 2024

Christopher J. Day, DAY LAW GROUP, LLC, Wilmington, Delaware, *Attorney for Plaintiff Richard A. Graciano*.

Michael J. Maiomone and Gabriella Mouriz, BARNES & THORNBURG LLP, Wilmington, Delaware, *Attorneys for Defendants Abode Healthcare, Inc. and BrightSpring Health Services, Inc*.

**GLASSCOCK, Vice Chancellor**

Like its 18th century English predecessor, the Delaware Court of Chancery is a court of limited jurisdiction. Setting aside jurisdiction derived from statute,[1] this Court may only act where complete relief is unavailable at law. That is the case where the law courts do not recognize an (equitable) cause of action, as well as where the cause of action is itself legal in nature, but where relief at law—money damages or declaratory judgment—are insufficient to remedy a plaintiff's injury.

The latter standard, in the hands of an artful pleader, is plastic; malleable to the extent that, without vigilance on the part of the Court, the legal shrubbery would soon overgrow the limited garden of equity. This matter requires such vigorous jurisdictional topiary.

Here, Plaintiff, a seller's representative under a purchase agreement, seeks to vindicate contractual rights. These are legal rights implicating monetary relief. Plaintiff points out, however, that the sellers' right to payment, under the contract, will come from an escrow fund. Plaintiff first argues that the contract itself requires an order of specific performance to accomplish release of the funds in escrow, but a reading of the plain contractual language makes it clear that a declaratory judgment (combined with Plaintiff's instruction to the escrow agent) is the only judicial action required under the agreement. Plaintiff also posits that, if he succeeds on the contract claims, the escrow agent may nonetheless balk at releasing the funds. But that would

---

[1] The parties here have not suggested any statute confers subject matter jurisdiction.

likely entail a bad-faith refusal to comply with the agent's contractual and fiduciary obligations, and is in any case speculative.  Speculation as to the need to employ equity to vindicate a legal judgment does not, in my view, invoke equitable jurisdiction, lest limited jurisdiction become a fiction.  In the event that an equitable ruling should prove necessary to complete relief post judgment, this Court is open, but speculation about the need for such relief, under these facts, is insufficient to that purpose.  My reasoning follows.

## I. BACKGROUND

*A. Factual Background*[2]

### 1. The Parties

Plaintiff Richard A. Graciano, Jr. ("Plaintiff"), along with David F. Graciano, Ross J. Nese, and Jeffrey J. Graciano (collectively, the "Sellers") each owned a percentage of Grane Hospital Care, Inc., a Pennsylvania corporation (the "Company").[3]  Collectively, the Sellers owned 100% of the Company prior to January 31, 2021, when Defendant Abode Healthcare, Inc. purchased the Company.[4]

Defendant Abode Healthcare, Inc. ("Abode") is a Delaware corporation.[5] Abode acquired all outstanding stock in the Company on January 31, 2021.[6]

---

[2] The following facts are drawn from the operative complaint.  *See* Am. Compl., Dkt. No. 10.
[3] *Id.* ¶¶ 1–2.
[4] *Id.* ¶¶ 2, 23.
[5] *Id.* ¶ 3.
[6] *Id.*

Abode did not abide, at least as an independent entity; Defendant BrightSpring Health Services, Inc. ("BrightSpring" and collectively with Abode, the "Defendants" or "Buyers") is a Delaware corporation that acquired Abode in February 2021.[7]

Nominal Defendant Citibank, N.A. (the "Escrow Agent" or "Citibank") is a national banking association that conducts business in Delaware.[8]

### 2. The CARES Act Grant

Following the onset of the COVID-19 pandemic in early 2020, the federal government approved the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").[9]  Under the CARES Act, federal funds were appropriated to reimburse qualified health care providers for health care-related expenses and lost revenue attributable to the COVID-19 pandemic.[10]  The federal Department of Health and Human Services ("HHS") distributed the CARES Act funds and the program was administered under the federal Health Resources & Services Administration ("HRSA").[11]  HRSA was tasked with determining the amount to pay

---

[7] *Id.* ¶ 4.
[8] *Id.* ¶ 5.
[9] *Id.* ¶ 14.
[10] *Id.* ¶ 15.
[11] *Id.*

each eligible provider, including the Company,[12] and automatically made distributions from the CARES Act funds.[13]

Over the course of 2020, the Company suffered from lost revenues amounting to millions of dollars while incurring direct COVID-19-related unreimbursed expenses.[14] In April 2020, as an eligible provider under the CARES Act, the Company received a Phase 1 general distribution of the CARES Act funds amounting to $1,884,212.75, subject to terms and conditions imposed by HRSA.[15] As a condition to receiving the CARES Act funds, the Company agreed to repay any CARES Act funds that were not used to pay for eligible COVID-19-related expenses or to replace lost revenues permitted under the HRSA Terms and Conditions and the HRSA Guidelines.[16]

### 3. Abode Purchases the Company

On July 9, 2020, Sellers and Abode entered into a confidentiality agreement so that Abode could conduct due diligence in connection with a potential purchase of the Company.[17] Thereafter, Sellers and Abode entered into a purchase agreement dated December 21, 2020 (the "Purchase Agreement").[18] Under the terms of the

---

[12] The Company has provided hospice care to terminally ill patients since December 2005. *Id.*¶ 17.

[13] *Id.* ¶ 16.

[14] *Id.* ¶ 18.

[15] *Id.* ¶ 17.

[16] *Id.* ¶ 19.

[17] *Id.* ¶ 22.

[18] *Id.* ¶ 23.

Purchase Agreement, Abode would acquire all of the issued and outstanding capital stock of the Company at closing on January 31, 2021.[19]

When the parties entered into the Purchase Agreement, the parties agreed that if the Company was required to repay, return, or reimburse any CARES Act funds received by the Company prior to the January 31, 2021 closing, Sellers would be liable for repayment.[20] Because the amount that Sellers could report as lost revenue incurred in 2020 was unknown in January 2021, it was uncertain if the Company would be required to repay any of the CARES Act funds it received in April 2020.[21] Accordingly, the parties agreed that the Sellers would escrow an amount equal to the amount of the CARES Act funds the Company received prior to closing to ensure that Buyers would have cash available to make any requirement repayment.[22]

### a. Escrow Account

When Abode's purchase of the Company closed on January 31, 2021, the parties executed an escrow agreement (the "Escrow Agreement", and collectively with the Purchase Agreement, the "Transaction Agreements").[23] Pursuant to the Escrow Agreement, Citibank was appointed the Escrow Agent and Sellers caused the Company to deposit $1,884,212.75 (the "Escrow Fund") into the escrow account

---

[19] *Id.*
[20] *Id.* ¶ 25.
[21] *Id.* ¶ 26.
[22] *Id.* ¶ 27.
[23] *Id.* ¶ 32.

5

(the "Escrow Account").[24]  Under the Escrow Agreement, the parties agreed to instruct the Escrow Agent to release from the Escrow Account first any repayment amount required by the federal government.[25]  If funds remained in the Escrow Account after the required repayment was made to the federal government, the parties agreed to instruct the Escrow Agent to then release to the Sellers funds totaling the amount expended, spent, or otherwise used for purposes permitted under the CARES Act on eligible pre-closing losses.[26]  After reimbursing the Sellers, if the Escrow Account still had funds, the parties agreed to instruct the Escrow Agent to release such remaining funds to the Company.[27]

### 4. BrightSpring Acquires Abode

In February 2021, BrightSpring closed its purchase of Abode.[28]  When BrightSpring was negotiating the purchase of Abode, BrightSpring was aware that Abode was also negotiating with Sellers to purchase the Company.[29]  Section 11.4 of the Purchase Agreement allows Sellers or Abode to assign the relevant rights and obligations under the Purchase Agreement to an affiliate who would then be bound by the Purchase Agreement's terms.[30]  Upon purchasing Abode, BrightSpring

---

[24] *Id.* ¶¶ 24, 32.
[25] *Id.* ¶ 29.
[26] *Id.* ¶ 30 (citing Am. Compl., Ex. A § 2.7(c)(ii)(x), Dkt. No. 10 (the "Purchase Agreement")).
[27] *Id.* ¶ 31 (citing Purchase Agreement § 2.7(c)(ii)(y)).
[28] *Id.* ¶ 41.
[29] *Id.* ¶¶ 42–43.
[30] *Id.* ¶ 44.

assumed all rights, obligations, and liabilities of Abode under the Transaction Agreements.[31]

### 5. The HRSA Report

The HRSA required each provider that had received CARES Act funds to report to HRSA by a specified deadline the allocation of the funds such provider received.[32] The portal to file an Initial CARES Act Funds Report ("HRSA Report") did not open until July 1, 2021, so the parties did not file such report prior to the January 31, 2021 closing date.[33] Moreover, the HRSA did not provide how to calculate lost revenues for CARES Act reporting purposes, until August 2021.[34] Ultimately, the Company was required to submit its first HRSA Report by November 30, 2021.[35] Buyers prepared the HRSA Report and allowed Sellers to review the HRSA Report before filing the HRSA Report on November 30, 2021.[36] The HRSA Report allocated the full $1,884,212.75 in CARES Act funds received by the Company.[37]

Section 2.7(c) of the Purchase Agreement provided, in relevant part, that if the HRSA had not made a final determination of the Company's repayment

---

[31] *Id.* ¶ 45.
[32] *Id.* ¶ 49.
[33] *Id.* ¶ 50.
[34] *Id.* ¶ 66.
[35] *Id.* ¶ 51. The initial deadline was September 30, 2021, but the Company received an extension. *Id.*
[36] *Id.* ¶ 52.
[37] *Id.*

obligations for the CARES Act funds, then three months after the Company filed the first post-closing HRSA Report, the "Buyer and Sellers' Representative shall deliver a joint written instruction to the Escrow Agent to release" the "aggregate amount equal to the portion (if any) of the [Escrow Funds] expended, spent or otherwise used by or on behalf of the Company on or before the Closing Date exclusively for the purposes permitted under the CARES Act," to Sellers.[38] The HRSA Report was filed on November 30, 2021, thus (per the complaint) on March 1, 2022, the Purchase Agreement obligated parties obligated to submit a joint release instruction (the "Joint Release Instruction") directing the Escrow Agent to release the Sellers' portion of the Escrow Funds to Sellers.[39]

On March 2, 2022, Sellers notified Buyers that the Escrow Funds had become due for release and provided Buyers with the proposed Joint Release Instructions.[40] Buyers have refused to execute the Joint Release Instructions.[41] Consequently, the Escrow Funds remain in the Escrow Account, and the Escrow Agent cannot release any portion of the Escrow Funds to Sellers.[42]

---

[38] *Id.* ¶ 53 (quoting Purchase Agreement § 2.7(c)(ii)(x)). Upon review of the field HRSA Report, the federal government determined that the Company was not required to repay any CARES Act funds received in 2020. *Id.* ¶ 76.
[39] *Id.* ¶ 54.
[40] *Id.* ¶¶ 56–57.
[41] *Id.* ¶ 82.
[42] *Id.* ¶ 83.

## B. Procedural History

On August 17, 2022, Plaintiff filed suit against Defendants.[43]   The initial complaint contained two counts: Count I for specific performance and Count II for breach of contract pertaining to the Escrow Account.[44]   Plaintiff filed an amended complaint on April 5, 2023, to add a third count for breach of contract that the parties have since resolved.[45]   On June 14, 2023, Plaintiff filed a motion for judgment on the pleadings.[46]   The briefing on Plaintiff's motion was stayed after I requested, *sua sponte*,[47] that the parties brief the issue of subject matter jurisdiction in accordance with this Court's decision in *ISS Facility Servs., Inc. v. JanCo FS 2, LLC*.[48]   The parties completed briefing the issue of subject matter jurisdiction on August 31, 2023.[49]   I heard oral arguments on November 29, 2023, and consider the matter fully submitted as of that date.[50]

---

[43] *See* Verified Compl. of Pl., Dkt. No. 1.

[44] *Id.* ¶¶ 85–94.

[45] *See* Am. Compl. ¶¶ 138–54; Opening Br. of Defs. 7 n.1, Dkt. No. 15 ("Defs.' OB").

[46] *See* Mot. of Pl. for J. on the Pleadings, Dkt. No. 12.

[47] *See Crown Castle Fiber LLC v. City of Wilmington*, 2021 WL 2838425, at \*3 (Del. Ch. July 8, 2021) ("The Court has a duty to determine whether it has subject matter jurisdiction over a plaintiff's claims and can raise the issue *sua sponte*."); *see also Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 77 n.5 (Del. Ch. 1991) ("[J]udges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties.").

[48] *See* Stipulation and Order Governing Briefing Schedule, Dkt. No. 14.

[49] *See* Reply Br. of Defs., Dkt. No. 19 ("Defs.' RB").

[50] *See* Judicial Action Form re Oral Argument via Zoom before Vice Chancellor Sam Glasscock dated 11.29.23, Dkt. No. 21.

## II. ANALYSIS

The Court of Chancery is a court of limited jurisdiction.[51] As such, this Court "can acquire subject matter jurisdiction over a cause in only three ways, namely, if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute."[52] Here, Plaintiff seeks to invoke this Court's equitable jurisdiction to obtain an equitable remedy, an order for specific performance.[53]

### A. *Equitable Jurisdiction and Specific Performance Generally*

Parties cannot contractually confer equitable jurisdiction where the Court otherwise lacks jurisdiction.[54] Instead, "[e]quitable jurisdiction must be determined from the face of the complaint as of the time of filing, with all material factual allegations viewed as true."[55] When reviewing the complaint to determine whether equitable jurisdiction exists, "[t]he Court must examine what the parties to the litigation are actually seeking . . . to ensure that Chancery jurisdiction is a necessity to adequate justice, and not . . . a 'formulaic "open sesame"' by which artful pleaders may attach equitable jurisdiction."[56]

---

[51] *See El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.*, 669 A.2d 36, 39 (Del. 1995).
[52] *Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).
[53] Am. Compl. ¶¶ 114–26.
[54] *El Paso Natural Gas Co.*, 669 A.2d at 39 (citing *Elia Corp. v. Paul N. Howard Co.*, 391 A.2d 214, 215–16 (Del. Super. 1978)).
[55] *Int'l Bus. Machs. Corp.*, 602 A.2d at 78.
[56] *Elavon, Inc. v. Elec. Transaction Sys. Corp.*, 2022 WL 667075, at *2 (Del. Ch. Mar. 7, 2022) (quoting *Int'l Bus. Machs. Corp.*, 602 A.2d at 78).

Where, as here, a plaintiff seeks to invoke this Court's equitable jurisdiction by requesting an order for specific performance, the plaintiff "must [be prepared ultimately to] prove by clear and convincing evidence" that she is entitled to such relief.[57] "Specific performance . . . is an equitable remedy by which a court of equity may compel the actual accomplishment of a contract by the party bound to fulfill it."[58] The purpose of specific performance is to address "situations where the assessment of money damages is impracticable or somehow fails to do justice."[59] Thus, to prove she is entitled to specific performance, a plaintiff must also prove that there exists no adequate remedy at law.[60] "[I]n order to be 'adequate', a legal remedy must be available as a matter of right, be full, fair and complete, and be as practical to the ends of justice and to prompt administration as the remedy in equity."[61]

### 1. Specific Performance and Escrow Accounts

Whether this Court has equitable jurisdiction based solely on a plaintiff's request for an order of specific performance or injunction to direct an agent to release escrowed funds is an issue with which the Court is familiar. In my view, the issue turns on whether the relief is necessary to the full vindication of the plaintiffs' rights,

---

[57] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[58] *E. Balt LLC v. E. Balt US, LLC*, 2015 WL 3473384, at *2 (Del. Ch. May 28, 2015) (internal quotation marks omitted).

[59] *Id.*

[60] *Minn. Invco of RSA No. 7, Inc. v. Midwest Wireless Hldgs. LLC*, 903 A.2d 786, 793 (Del. Ch. 2006).

[61] *Clark v. Teeven Hldg. Co., Inc.*, 625 A.2d 869, 881 (Del. Ch. 1992).

11

and not merely speculative or pretextual. In addressing this issue, this Court has issued conflicting lines of decisions: those that find such a request is facially sufficient to invoke this Court's equitable jurisdiction, and those that find this Court lacks jurisdiction unless is appears that full relief is unavailable without equitable intervention. Naturally, the parties in the instant matter have relied upon the line of cases that reach their preferred outcome for this motion. I will briefly discuss the reasoning used in each line of decisions to support their respective conclusions, beginning with this Court's decision in *East Balt*.

In *East Balt*, this Court concluded it could assert equitable jurisdiction over the plaintiffs' request for an order of specific performance requiring the defendants to issue instructions to the escrow agent to release escrowed funds.[62] To reach this conclusion, the Court explained that, even if plaintiff were to receive declaratory relief in its favor from a court of law, plaintiff would have to seek recourse in the Court of Chancery to enforce the declaratory judgment against the non-party escrow agent.[63] Therefore, the Court reasoned the remedy available at law was inadequate as it "would not be as certain, prompt, complete, or efficient as the equitable remedies" sought by the plaintiffs.[64]

---

[62] *E. Balt LLC*, 2015 WL 3473384, at *2, 4.
[63] *Id.* at *3–4 (citing *SecNet Hldgs., LLC, v. Potash*, C.A. No. 7781-VCP, at 33–35 (Del. Ch. Apr. 2, 2013) (TRANSCRIPT)).
[64] *Id.* at *4.

Subsequent decisions as have followed *East Balt* found that this Court has equitable jurisdiction over a plaintiff's request for an order of specific performance requiring the defendants to cause an escrow agent to release escrowed funds. *United BioSource LLC v. Bracket Holding Corporation* had analogous facts to those in *East Balt* and similarly concluded that the Court had equitable jurisdiction to grant an order for specific performance for the non-party escrow agent to release the escrowed funds at issue on grounds that relief at law would not be complete.[65] In *American Healthcare Administrative Services, Inc. v. Aizen*, the Court built on the holding in *East Bolt* to find that equitable jurisdiction existed where the plaintiffs "point[ed] to provisions in the Purchase Agreement that provide expressly for a decree of specific performance and stipulate to the existence of irreparable harm in the event of a breach."[66] According to the *Aizen* Court, these contractual provisions established that the plaintiffs had no adequate remedy at law.[67]

Other decisions in our jurisdiction have reached conclusions than depart from the reasoning in *East Balt*. In *Evalon, Inc. v. Electronic Transaction Systems Corporation*, this Court found that it lacked equitable jurisdiction over a plaintiff's request for an order of specific performance to direct an escrow agent to release the

---

[65] *United BioSource LLC v. Bracket Hldg. Corp.*, 2017 WL 2256618, at *4 (Del. Ch. May 23, 2017).

[66] 285 A.3d 461, 495 (Del. Ch. 2022).

[67] *Id.* at 495–97. I note that *Aizen* is not squarely under the *East Balt* line, in that it focused not on the request for equitable relief alone, but, significantly, on an examination of the contract at issue and whether enforcement at law would be complete.

13

escrowed funds.[68] To reach this conclusion, the Court distinguished the facts from *East Balt* by noting that the *Evalon* plaintiff sought legal relief in the form of the release of escrowed funds either through joint release instructions from the parties or with a final order from a court, but the plaintiff failed to plead sufficient facts to demonstrate a need for injunctive relief.[69] The *Evalon* Court explained that "[a] legal action cannot be transformed into an equitable one merely suggesting that contingent relief, such as an escrow agent gone rogue, may necessitate an injunction."[70] Similarly, in *ISS Facility Services, Inc. v. JanCo FS 2, LLC*, this Court found that the plaintiffs had a sufficient remedy at law even where there was contractual language requiring an escrow agent to release escrowed funds upon receipt of a final order from a court of competent jurisdiction.[71] This examination of the need for equity, and not simply the request for equity, departs from *East Balt*. Importantly, to my mind, this approach of looking for the true nature of the relief required, under the facts asserted in the complaint, is consistent with this Court's duty to disallow jurisdiction through artful pleading alone, as called for under *Comdisco* and its progeny.

---

[68] 2022 WL 667075, at *2–4 (Del. Ch. Mar. 7, 2022).
[69] *Id.* at *3.
[70] *Id.* at *4.
[71] 2023 WL 4096014, at *1–2 (Del. Ch. June 20, 2023).

*B. Equitable Jurisdiction Over the Specific Performance Sought Here*

In the instant case, Plaintiff seeks an order of specific performance to require Buyers to comply with the Escrow Agreement or, in the alternative, to require the Escrow Agent to release the Escrow Funds in accordance with written instructions included in a court order for specific performance.[72] Based on the Court's decision in *ISS Facility*, I requested supplemental briefing to assist me in determining whether Plaintiff's request requires this Court's equitable jurisdiction.[73]

Buyers have refused to issue Joint Release Instructions to release the Escrow Funds under the terms of the Purchase Agreement, due to a disagreement about amounts due.[74] In such circumstances, the Escrow Agreement provides for alternative mechanisms to govern the release of the Escrow Fund by the Escrow Agent. Specifically, the Escrow Agreement provides:

> Upon receipt by the Escrow Agent of a Final Order from any Party, together with proof of simultaneous delivery thereof to the other Party, the Escrow Agent shall within five (5) Business Days following receipt of such Final Order, disburse as directed in such Final Order, part or all, as the case may be, of the applicable Escrow Funds (but only to the extent funds are available in the applicable Escrow Account(s)) from the applicable Escrow Account(s) in accordance with such Final Order. Notwithstanding the foregoing, while the Escrow Agent may act on such Final Order without further inquiry, the Escrow Agent shall be entitled to request an opinion of counsel of the prevailing Party to the effect that an order or judgment is final and non-appealable and from a

---

[72] Pl.'s Suppl. Answering Br. on Issue of Jurisdiction 22–24, Dkt. No. 18 ("Pl.'s AB").
[73] *See* Stipulation and Order Governing Briefing Schedule, Dkt. No. 14.
[74] Am. Compl. ¶ 82.

court of competent jurisdiction for purposes of this Section [ ] before making such disbursement.[75]

The Escrow Agreement defines the term "Final Order" as follows:

"Final Order" means a certified copy of a final non-appealable order or judgment of any court of competent jurisdiction or arbitrator awarding amounts to be paid out of any of the Escrow Accounts, *together with* (A) a certificate of the prevailing Party to the effect that such order or judgment is final and non-appealable and from a court of competent jurisdiction or arbitrator (in each case in accordance with the terms of the Purchase Agreement) having proper authority *and* (B) the written payment instructions of *the prevailing Party* to effectuate such order or judgment.[76]

Plaintiff advances three principal arguments in favor of this Court's equitable jurisdiction over this dispute: (1) the Amended Complaint facially seeks relief that is equitable in nature; (2) the parties agreed to this Court's equitable jurisdiction in the Transaction Agreements; and (3) equitable jurisdiction is inevitable.

### 1. Equitable Jurisdiction From the Face of the Amended Complaint

Plaintiff asserts that the Amended Complaint sufficiently states a request for equitable relief on its face because the primary relief sought is an order of specific performance requiring Defendants "to deliver a joint written instruction the Escrow Agent to release" the escrowed Escrow Funds.[77]  In response, Defendants note that the Purchase Agreement clearly provides for an alternative remedy if Defendants

---

[75] Am. Compl., Ex. B ¶ 4(a)(ii), Dkt. No. 10 ("Escrow Agreement").
[76] *Id.* (emphases added).
[77] Pl.'s AB 22 (quoting Purchase Agreement § 2.7(c)(ii)).

16

refuse to execute the Joint Release Instructions, which alternative Plaintiff is in fact pursuing in its lawsuit.[78]  Specifically, the Purchase Agreement states that either party is  entitled to file suit against the other for breach of contract and seek monetary relief in accordance with the Escrow Agreement.[79]  Thus, the Escrow Agreement furnishes Plaintiff with an adequate remedy at law.[80]

Plaintiff is correct that this Court will determine whether it has equitable jurisdiction by reviewing the face of the complaint.[81]  However, when reviewing the complaint, the Court must "take a practical view of the complaint, and [ ] not permit a suit to be brought in Chancery where a complete legal remedy otherwise exists[.]"[82]  Put another way, the Court's consideration of whether it has equitable jurisdiction to decide a dispute is not limited to a review of the prayer for relief included in a complaint, or else an artful pleader's "incantation of magic words" would circumvent this Court's otherwise limited jurisdiction.[83]  Instead, this Court "review[s] the allegations of the complaint as a whole to determine the true nature of the claim."[84]  To ascertain the true nature of a plaintiff's claims, the Court conducts "a realistic assessment of the nature of the wrong alleged and the remedy

---

[78] Defs.' OB 14–15.
[79] *Id.* at 14.
[80] *Id.* at 15.
[81] Pl.'s AB 22 (citing *Int'l Bus. Machs. Corp.*, 602 A.2d at 78).
[82] *Int'l Bus. Machs. Corp.*, 602 A.2d at 78.
[83] *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987).
[84] *Christiana Town Ctr., LLC v. New Castle County*, 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003).

available in order to determine whether a legal remedy is available and fully adequate."[85]

Upon a holistic review of the allegations in the Amended Complaint, I conclude that Plaintiff brought this suit in pursuit of legal relief. The driving force behind this lawsuit is Plaintiff's desire to obtain escrowed funds that Plaintiff believes he is entitled to under the Transaction Agreements. Even though Plaintiff asserts that the most efficient manner to obtain the Escrow Funds is a court order for specific performance, such assertion does not change the true nature of this lawsuit. Besides a formulaic statement that an order for specific performance is required for Plaintiff to have "certain, efficient, and complete relief," Plaintiff fails to explain why equitable jurisdiction is necessary for him to obtain the legal remedy sought. Thus, my inquiry into whether this Court has equitable jurisdiction will not end with the face of the Amended Complaint.

### 2. Equitable Jurisdiction Under the Transaction Agreements

Despite the fact that "[i]t is settled law that parties may not confer subject matter jurisdiction by agreement[,]"[86] Plaintiff nevertheless contends that this Court should defer to the parties' interpretation of the language of their own agreements governing the business relationship.[87] In asserting that the Transaction Agreements

---

[85] *McMahon*, 532 A.2d at 603.
[86] *Thompson v. Lynch*, 990 A.2d 432, 434 (Del. 2010).
[87] Pl.'s AB 2.

18

confer equitable jurisdiction on this Court, Plaintiff relies on his interpretation of two aspects of the Transaction Agreements: (1) the definition and use of the term "Final Order;" and (2) the inclusion of a "Specific Performance Clause."

### a. Equitable Jurisdiction to Issue the "Final Order"

Plaintiff asserts that the language of the Transaction Agreements unambiguously require that the contractually-defined term "Final Order" be a court order expressly ordering specific performance, a form of relief only available from the Court of Chancery.[88] Paragraph 4(a)(ii) of the Escrow Agreement dictates that the Escrow Agent is required to "disburse as directed in such Final Order, part or all, . . . of the Escrow Funds . . . in accordance with the Final Order."[89] "Final Order" is a defined term in the Agreement. It is defined, in relevant part, as "a final non-appealable order or judgment of any court of competent jurisdiction . . . awarding amounts to be paid out of any of the Escrow Accounts together with . . . the written payment instructions of the prevailing Party to effectuate such order or judgment."[90] According to Plaintiff, when these two provisions are read together, the definition of Final Order permits the Escrow Agent to disburse Escrow Funds *only* as specifically directed *by the court*.[91] Therefore, per Plaintiff, the language of the

---

[88] *Id.* at 12–15.
[89] *Id.* at 13 (quoting Escrow Agreement ¶ 4(a)(ii)).
[90] Escrow Agreement ¶ 4(b)(ii).
[91] Pl.'s AB 14.

Escrow Agreement requires the equitable power of the Court of Chancery to cause the Escrow Agent to act.

In response, Defendants argue that the language in the Escrow Agreement is unambiguous in its mandate that the Escrow Agent release the Escrow Funds upon receipt of a Final Order.[92] The contractual definition of Final Order does not require *the court* to give the Escrow Agent written instructions to effectuate the court's order.[93] Rather, the language of the Escrow Agreement allows for either party to obtain a court order adjudicating the amount of the Escrow Funds to which the party is contractually entitled and to deliver that to the Escrow Agent, along with the *prevailing party's* written instructions.[94] Only where the *Escrow Agent* defies the court order does the Escrow Agreement contemplate an order of specific performance from this Court.[95]

The Transaction Agreements unambiguously require that the Escrow Agent disburse the Escrow Funds upon receipt of a Final Order. Plaintiff emphasizes that this disbursement must be done "in accordance with the Final Order." However, as just described, "Final Order" is a contractually defined term; Final Order comprises (1) "a final non-appealable order or judgment of any court of competent jurisdiction

---

[92] Defs.' OB 14.
[93] *Id.* at 14–15.
[94] *Id.* at 13.
[95] *Id.* at 13–14.

. . . awarding amounts to be paid out of any of the Escrow Accounts"; (2) "a certificate *of the prevailing Party*" certifying that the court "order or judgment is final and non-appealable and from a court of competent jurisdiction"; *and* (3) "written payment instructions *of the prevailing Party* to effectuate such order or judgment."[96]

The plain language of the Transaction Agreements does not require a court order for specific performance. As it is defined, the Final Order requires the prevailing party to instruct the Escrow Agent on how to disburse the Escrow Funds in accordance with the court's decision. Put another way, the court itself does not provide written instructions directing the Escrow Agent *how* to disburse the Escrow Funds; those instructions are to come from the prevailing party. Therefore, the Transaction Agreements' definition and use of Final Order do not invoke equity to issue an order for specific performance.

### b. Equitable Jurisdiction Under the Specific Performance Clause

Plaintiff next argues that the Purchase Agreement includes a "Specific Performance Clause" that, according to Plaintiff, contains language under which I

---

[96] Escrow Agreement ¶ 4(b)(ii) (emphases added).

must conclude that equitable jurisdiction exists.[97]  Here, the Specific Performance

Clause states, in relevant part:

> The parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Transaction was not consummated, and that money damages would not be an adequate remedy, even if available.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the Delaware Courts, this being in addition to any other remedy to which they are entitled at law or in equity.  Each of the parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity.[98]

While Delaware is a contractarian state that will honor parties' contractual

agreements unless doing so would contradict public policy,[99] "[i]t is settled law that

parties may not confer subject matter jurisdiction by agreement."[100]  If the Court

were to defer to the parties' contractual agreement to decide whether the ability of

the Court to assert equitable jurisdiction over a dispute, limited jurisdiction would

have no meaning; *all* contracting parties who wish for their dispute to be heard in

the Court of Chancery, regardless of the true nature of the dispute, would be

---

[97] Pl.'s AB 9–10; *see Aizen*, 285 A.3d at 495–97 (basing jurisdiction in part on contractual recitation of insufficiency of legal relief).

[98] Purchase Agreement § 11.11.

[99] *See Cantor Fitzgerald, L.P. v. Ainslie*, 2024 WL 315193, at *1 (Del. Jan. 29, 2024).

[100] *Thompson*, 990 A.2d at 434.

22

permitted to contractually agree to this Court's jurisdiction. Put another way, the parties may bind themselves, they may not bind the Court, and they may not provide a context in which this Court may violate the jurisdictional limitations imposed upon it by the Delaware Constitution.

Even though the parties contractually agree that any breach of the Transaction Agreements would result in irreparable harm that could only be remedied through an order for specific performance, it is incumbent upon the Court to "determine the 'true reason' for which the plaintiff has brought suit."[101] At the heart of this complaint is Plaintiff's desire to receive the Escrow Funds to which Plaintiff believes he is contractually entitled. While the parties contractually agreed "that money damages would not be an adequate remedy"[102] for any breach of the Transaction Agreements, that does not change that the ultimate relief Plaintiff seeks is monetary, relief that may be vindicated by a final judgment at law. Finally, I note, obtaining a court order, and submitting it to the Escrow Agent with the required certification and instructions, is itself an explicit contractual remedy endorsed by the contracting parties.

---

[101] *Int'l Bus. Machs. Corp.*, 602 A.2d at 78.
[102] Purchase Agreement § 11.11.

### 3. Equitable Jurisdiction as Inevitable

Finally, Plaintiff avers that this Court's equitable jurisdiction is inevitable to enforce any court order.[103] According to Plaintiff, invoking this Court's equitable jurisdiction to order specific performance at this early stage "would not be the result of the tail wagging the dog based upon an uncertain future contingency[,]" but rather is necessary to provide Plaintiff with complete and efficient relief that cannot otherwise be accomplished.[104] Plaintiff posits that he is not asking for this Court to invoke its equitable jurisdiction to avoid a hypothetical future failure of the Escrow Agent to comply with a court order.[105] In support of this contention, Plaintiff reasserts his interpretation that the Escrow Agreement requires the Final Order to include written instructions specifically directing the Escrow Agent to disburse the Escrow Funds.[106] Therefore, according to Plaintiff, declaratory judgment would be insufficient to cause the Escrow Agent to act under the terms of the Escrow Agreement.[107] I have rejected this reading of the Transaction Agreements, above.

This leaves Plaintiff's argument that equitable relief will be required to compel the Escrow Agent to act. Defendants criticize Plaintiff's position as assuming that the Escrow Agent will ignore a court order issued by the Superior

---

[103] Pl.'s AB 17–18.

[104] *Id.* at 21–22.

[105] *Id.* at 21 (distinguishing the facts from those in *Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2019 WL 3451376 (Del. Ch. July 31, 2019)).

[106] *Id.*

[107] *Id.* at 21–22.

Court.[108]  According to Defendants, the Escrow Agreement creates a two-step process for either party to enforce the Escrow Agreement where the parties cannot agree to Joint Release Instructions.[109]  Under this two-step process, Plaintiff must first seek and obtain an order from a court of competent jurisdiction to deliver to the Escrow Agent.[110]  Only if the Escrow Agent refuses to disburse the funds in accordance with the Final Order, as defined by the Escrow Agreement, can Plaintiff then invoke the second step, which would be to seek specific performance from the Court of Chancery to enforce the Final Order.[111]  In other words, equity is only invoked upon a future, speculative breach by the Escrow Agent of the Escrow Agreement.  In Defendants' opinion, Plaintiff's request to invoke equitable jurisdiction at this juncture invokes equity which may never be required.[112]  I agree.

The Escrow Agreement directs the Escrow Agent to disburse the Escrow Funds if one of two situations occurs: (1) the parties deliver Joint Release Instructions or (2) a party obtains and delivers a Final Order, as defined in the Escrow Agreement.[113]  While Plaintiff believes both (1) and (2) require an order of this Court directing a party to specifically perform, specific performance is not implicated at all for option (1) and a declaratory judgment issued by the Superior

---

[108] Defs.' RB 5.
[109] *Id.* at 13.
[110] *Id.*
[111] *Id.*
[112] *Id.* at 13–14.
[113] Escrow Agreement ¶¶ 4(a)(i)–(ii).

Court (together with the requisite certification and instructions from the prevailing party) is adequate to cause the Escrow Agent to release the Escrow Funds under option (2). As I explained above in Section II.B.2.a, the Escrow Agreement does not narrowly define the term Final Order to require the court issuing such order or judgment to include written instructions on how the Escrow Agent is to disburse the Escrow Funds. Instead, the definition of the term Final Order requires that the *prevailing party* provide the Escrow Agent with written instructions to effectuate the court's order or judgment, at which point the Escrow Agent's contractual duty to release the funds is triggered.

Accordingly, a declaratory judgment obtained from the Superior Court that adjudges Plaintiff's entitlement to receive a disbursement from the Escrow Account, alongside written instructions from Plaintiff, satisfies the contractual definition of a Final Order and is sufficient to cause the Escrow Agent to act. Plaintiff has an adequate remedy at law in the form of a declaratory judgment from the Superior Court. Equitable relief will only become necessary if the Escrow Agent refuses to act in accordance with such Final Order. There is no indication in the record that the Escrow Agent, who is bound by contractual and fiduciary duties, will refuse to comply with a declaratory judgment issued by the Superior Court, supplemented by the prevailing party as contractually mandated. To invoke equitable jurisdiction at this early juncture would contradict the principle that the Court of Chancery is a

court of limited jurisdiction.[114]   Therefore, the Amended Complaint must be dismissed for lack of subject matter jurisdiction.

### III. CONCLUSION

This Court lacks equitable jurisdiction, because an adequate remedy at law exists.  Therefore, Defendants' Motion to Dismiss is GRANTED, with leave to refile in Superior Court.[115]   The parties shall submit a form of order in accordance with this memorandum opinion.

---

[114] *See Athene Life & Annuity Co.*, 2019 WL 3451376, at *7–8 (explaining "that if the mere threat of future breach or disregard of court orders triggered equitable jurisdiction, such jurisdiction would be general, not limited.").
[115] 10 *Del. C.* § 1902.